IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRYANT JONES,                          )
                                       )
             Petitioner,               )        Civil Action No. 2:19-1070
                                       )
      v.                               )
                                       )        Magistrate Judge Patricia L. Dodge
JAMIE LUTHER, *et al.*,                )
                                       )
             Respondents.              )

## MEMORANDUM

Pending before the Court[1] is the Petition for a Writ of Habeas Corpus filed by state prisoner

Bryant Jones ("Petitioner") pursuant to 28 U.S.C. § 2254. (ECF No. 1.) For the reasons set forth

below, the Court will deny the petition and will deny a certificate of appealability.

**I.      Introduction**

At the conclusion of a trial held in June 2010 in the Court of Common Pleas of Allegheny

County, a jury found Petitioner guilty of first-degree murder in the death of Randy Edwards (the

"victim"), who was shot in the basement of his home on January 13, 2008. The jury also convicted

Petitioner of robbery and carrying a firearm without a license. Attorney Eric Jobe ("trial counsel")

represented Petitioner at his trial.

The victim's brother, Terrence Edwards ("Terry"), Terry's girlfriend, Dominique Burwell,

and her two young children were living with the victim at the time of his murder. The victim and

Terry were known drug dealers and, by coincidence, their home was under police surveillance on

January 13, 2008. (Trial Tr. at pp. 69, 233.) As part of this surveillance, the victim's and Terry's

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties voluntarily consented to have a U.S. Magistrate Judge conduct proceedings in this case, including entry of a final judgment.

telephones were being monitored and detectives were watching and recording who was entering and exiting the home. Det. Steckel was in a surveillance van, which was retrofitted with zoom cameras, observing and filming the activity around the house. (*Id.* at pp. 71, 74, 82, 90.) He was in communication with Det. Hennessy and Det. Mullen, who were in a separate vehicle conducting mobile surveillance.[2] (*Id.* at pp. 70, 73-74, 90, 223-24.) Another detective was in a monitor room at the FBI office listening to intercepted phone calls (*id.* at 70-71), and Det. Countryman was monitoring the wiretaps and transcribing telephone calls to and from Terry. (*Id.* at pp. 282-83.)

In the Petition for a Writ of Habeas Corpus (ECF No. 1), Petitioner asserts that trial counsel provided him with ineffective assistance in violation of his Sixth Amendment rights. He raises the following six claims, which he labeled Claims A through F:

- **Claim A**: Trial counsel was ineffective for failing to call Det. Steckel to testify regarding the timeline of events. Petitioner argues trial counsel should have called Det. Steckel to testify that he saw Petitioner leave the victim's home at 11:34 a.m., approximately eight minutes before the 911 call was placed reporting the shooting.

- **Claim B**: Trial counsel was ineffective for failing to object to Det. Hennessy's testimony regarding statements he received from Det. Steckel in connection with the surveillance timeline. Petitioner argues that Det. Hennessy's allegedly improper testimony that Petitioner exited the victim's home at 11:38 a.m.[3] (approximately four minutes before the 911 call was placed) enabled the Commonwealth to establish an erroneous timeline of events which placed Petitioner inside the victim's home at the time of the shooting.

- **Claim C**: Trial counsel was ineffective for failing to object to the Commonwealth's allegedly improper authentication of the victim's cellphone records through the testimony of Det. Countryman. Instead, Petitioner argues, trial counsel should have called a Cricket Communications representative to authenticate those records.

---

[2] Det. Steckel did not testify at Petitioner's trial. During his testimony, Det. Hennessey stated that Det. Steckel was not available to testify because he recently had surgery and was not feeling well. (Trial Tr. at p. 71.)

[3] Petitioner asserts that trial counsel should have objected to Det. Hennessey's timeline testimony on the grounds that it was hearsay and its admission violated his rights under the Confrontation Clause.

- **Claim D**: Trial counsel was ineffective for failing to object to the trial court's allegedly inadequate cautionary instruction regarding testimony given by the victim and Terry's cousin, Leonard Edwards ("Leonard"), about a conversation he had with Petitioner when they were in prison at the Allegheny County Jail.

- **Claim E**: Trial counsel was ineffective for failing to investigate Terry's criminal history and request a jury instruction for *crimen falsi*.

- **Claim F**: The cumulative effect of trial counsel's errors denied Petitioner a fair trial.

(ECF No. 1-1 at pp. 49-78.)

Petitioner concedes that he filed his habeas claims outside the applicable one-year statute of limitations, which was enacted by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). (*Id.* at pp. 41-49; ECF No. 20 at p. 3.) He argues that in accordance with the Supreme Court's decision in *McQuiggin v. Perkins*, 569 U.S. 383 (2013), the Court must excuse his failure to comply with AEDPA's limitations period because he has produced new evidence of his innocence that provides a "gateway" through which the Court may consider his untimely federal habeas claims.[4]

This alleged new evidence is an affidavit signed by Terry and dated June 5, 2013 ("Terry's 2013 Affidavit"). As discussed in more detail below, in this affidavit Terry recanted his trial testimony and stated that another individual, whom he refused to identify, shot the victim.[5] Petitioner also relies upon a supplemental police report prepared by Det. Ladley the day after the murder, on January 14, 2008 ("Det. Ladley's 2008 Police Report"). In that report, Det. Ladley

---

[4] Petitioner refers to this argument as his "gateway actual innocence claim," and the Court will do the same.

[5] Petitioner attached Terry's 2013 Affidavit as Exhibit A to his habeas petition. (ECF No. 1-1 at pp. 80-81). It is notarized and Respondents do not challenge its authenticity. Rather, as explained below, Respondents contend that the averments contained in Terry's 2013 Affidavit are not reliable and, therefore, are insufficient to satisfy Petitioner's burden under *McQuiggin*.

wrote that Det. Steckel informed him that he had recorded in his surveillance notes that an individual (who was later confirmed to be Petitioner) left the victim's house at 11:34 a.m.[6]

## II. Relevant Background[7]

### A. The trial

Dr. Todd Luckasevic, a forensic pathologist with the Allegheny County Medical Examiner's Office, performed the autopsy of the victim. (Trial Tr. at pp. 39, 41-42.) He testified that the victim was shot four times—once to the left lower chest, once to his left upper abdomen, once to his left hip/pelvis region, and once to his left hand (*Id.* at pp. 43, 45-47).

Officer Hess worked for the North Braddock Police Department on January 13, 2008.[8] He testified that on that date he was dispatched to the victim's home to respond to 911 call. (*Id.* at pp. 55-56.) Officer Hess testified the 911 call was received at approximately 11:42 a.m. (*Id.* at pp. 56, 65.) After he arrived at the scene, Officer Hess stated, he approached the house and observed Terry looking out the basement door. Terry told him there was a male in the house who had been shot. (*Id.* at p. 58.) Officer Hess entered the house and went to the basement. He observed the victim lying motionless at the bottom of the steps. Terry's cousin, Leonard, was giving the victim CPR. (*Id.* at pp. 58-59, 61-65.)

---

[6] Petitioner attached Det. Ladley's 2008 Police Report as Exhibit B to his habeas petition. (ECF No. 1-1 at p. 83.) Det. Ladley wrote in his report that he examined the surveillance tape and the "date and time stamp were not visible on [it]." Therefore, Det. Ladley "contacted Det. Steckel and requested his assistance to determine event times on the tape. Det. Steckel arrived at the lab and produced notes indicating that a person exited the [victim's] residence at 11:34 AM and left in a gold colored Jeep." (*Id.*)

[7] Respondents attached as exhibits to the Answer (ECF No. 7) relevant state-court filings and decisions. Respondents also submitted to the Court Petitioner's original state court record, which includes the transcripts from his trial, preliminary and sentencing hearings, and the hearing held in his state collateral proceeding under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. § 9541 *et seq.*

[8] Officer Hess was not part of the task force conducting surveillance of the victim's home.

Officer Hess testified that it was "total pandemonium" in the house at that time and he did not ask Terry who shot the victim. Terry did tell Officer Hess the shooter left the scene in a gold Jeep. (*Id.* at pp. 62, 67.)

During his testimony, Det. Hennessey explained that he and Det. Mullen were in a vehicle conducting mobile surveillance of the victim's home and Det. Steckel was in another surveillance van observing and recording the activity outside the home. Det. Steckel would radio pertinent information to Det. Hennessey concerning the surveillance. (*Id.* at p. 71.)

Det. Hennessey explained that his testimony regarding the timing of events was based upon the entries he made in his logbook during the surveillance. Det. Hennessey further explained that he recorded in his logbook what Det. Steckel said he was observing from his (Det. Steckel's) undercover vehicle. When Det. Hennessey made his notations in his logbook, he also recorded the time that was displayed on the clock radio in his (Det. Hennessey's) undercover vehicle. Although that clock radio "was close to being accurate[,]" Det. Hennessey stated, it may not have been set to the precise time of day. (*Id.* at pp. 74-76.)

According to Det. Hennessey, at approximately 11:34 a.m. he received information from Det. Steckel that a black male entered the victim's house and a gold colored Jeep was parked in front of the residence. (*Id.* at p. 74.) Det. Hennessey testified that at approximately 11:38 a.m. Det. Steckel informed him that the black male exited the victim's house and entered the passenger's side of the gold Jeep. (*Id.* at pp. 76, 87.)

Det. Hennessey and Det. Mullen followed the gold Jeep in their undercover vehicle. They obtained its license plate number and started driving back towards the victim's home. Det. Hennessey testified that at approximately 11:45 a.m. Det. Steckel advised them that local police had responded to the home because of a reported of a shooting. (*Id.* at p. 79.)

Det. Hennessey and Det. Mullen ran the license plate number for the gold Jeep and they later located it at a jitney stand near Petitioner's home. (*Id.* at pp. 80-81.) The gold Jeep was impounded and processed for fingerprints. Robert Green, a jitney driver, was identified as the owner of the gold Jeep. Forensic testing introduced at Petitioner's trial demonstrated that a fingerprint lifted from the handle of the passenger's side door matched Petitioner's right ring finger. (*Id.* at pp. 81, 253-54, 280.)

The Commonwealth played for the jury the video surveillance footage of the victim's house around the time of the shooting. It showed Petitioner leaving the house with something under his arm and the gold Jeep approaching the house. (*Id.* at pp. 86-87.) Det. Hennessey testified once again that, according to the notes he made in his logbook, this event occurred at approximately 11:38 a.m. (*Id.*)

Terry's girlfriend, Burwell, testified that when she was upstairs getting dressed on January 13, 2008 she heard a series of "booms." She did not immediately realize that what she heard were gunshots. (*Id.* at 111, 118.) Burwell testified that her four-year-old son came running up the steps "and then later on" she heard Terry run up the steps. (*Id.* at p. 111.) Terry told Burwell to "hide the kids and call the police[.]" (*Id.*) According to Burwell, Terry was hysterical and stated "[t]hat n----- killed my brother." (*Id.*) Terry told her he was going to get his gun or call his cousin Leonard. He then ran out the back door of the house. (*Id.* at pp. 112-14.)

Burrell called 911. (*Id.* at p. 113.) During cross-examination, trial counsel asked Burrell how much time elapsed between when she heard the gunshots and when she placed the 911 call. She replied: "I am confused at the time. So whenever I seen Terry was serious, I proceeded to call 911. I'm not sure exactly how much longer it was after that." (*Id.* at p. 119.) Trial counsel asked

her: "It's fair to say if your brother-in-law was shot, you would call 911 pretty quickly, right?" Burwell responded: "Right." (*Id.*)

Burwell testified that Terry told her that he saw Petitioner shoot the victim but that he did not want to tell the police and be considered a snitch. Terry asked Burwell to report she witnessed the shooting. (*Id.* at pp. 115-18.) Therefore, when Burwell was first interviewed by a police officer she reported that she witnessed the shooting. During that same interview, however, Burwell admitted to the officer that Terry had asked her to lie because he did not "want to be the one to testify against [Petitioner]." (*Id.*)

The jitney driver, Green, testified he stated that he had no recollection of the events of January 13, 2008. (*Id.* at pp. 133-42.) Green indicated that he was nervous with police and legal authorities and did not want to be testifying. (*Id.* at pp. 140- 41.) He denied seeing Petitioner in his jitney with a firearm or dropping him off at a location where gunshots occurred. (*Id.* at p. 143.)

The Commonwealth played for the jury the taped statement Green gave to the police the evening of January 13, 2008. Green stated that he received a phone call from a number which was later confirmed to be Petitioner's telephone number. (*Id.* at pp. 151, 156.) Green then picked up an individual who directed him to drive to the victim's house. The individual also used Green's cellphone to place a call to the victim's cellphone as they were pulling up to the house. (*Id.* at pp. 151-53.) According to Green's cellphone records, that call occurred at 11:36 a.m. (*Id.* at pp. 284-85.)

Green stated he arrived at the victim's home and the individual got out of his gold Jeep. Green then drove to the end of the street, turned around, parked his Jeep, and waited for the individual to exit the house. (*Id.* at pp. 151-52.) Green said the individual was in the house for approximately five to seven minutes and when he exited it he was carrying a brown paper bag. (*Id.*

at pp. 154-56.) The individual got back into Green's gold Jeep and Green drove him from the scene. (*Id.* at p. 152.)

Det. Mullen, who was riding in Det. Hennessey's surveillance vehicle, testified that after Det. Steckel advised them of the shooting they returned to the victim's house and he (Det. Mullen) went inside. (*Id.* at pp. 226-27.) He entered the basement and saw Leonard attending to the victim and Terry standing off to the side. Det. Mullen stated that the victim was moving and "Leonard was definitely talking to [the victim]." (*Id.* at pp. 228-29.) After the paramedics transported the victim from the house, Det. Mullen requested that Terry step outside to speak with him. Terry told Det. Mullen that someone entered the house, shot the victim, stole drugs, and left in a gold Jeep. (*Id.* at pp. 230-31.) Terry did not tell Det. Mullen he knew the identity of the shooter. (*Id.*)

When Det. Countryman testified, the prosecutor asked him to identify the cellphone records of the victim, which were provided by Cricket Communications. Det. Countryman did so and the Commonwealth introduced those records as an exhibit. (*Id.* at p. 283-84.) They demonstrated that Petitioner and the victim were in communication the morning of the murder and that a call, which lasted forty seconds, was placed from Green's cellphone to the victim's cellphone at 11:36 a.m. (*Id.* at pp. at 288-89.)[9]

The Commonwealth played for the jury the recordings of calls to and from Terry's cellphone the day of the shooting. At 12:14 p.m. Terry called Durob Johnson and identified the shooter as "Chrome," which is Petitioner's nickname. At 12:40 p.m., Terry called Radee Barry and stated that "some motherfucker shot [the victim] up[.]" Terry told Barry: "I don't know how many times. It was a bunch of times, man. I couldn't even get down the steps." At 2:17 p.m., Terry

---

[9] Thus, the cellphone records indicated that Det. Hennessey's timeline testimony may have been off by a minute or two, since Det. Hennessey's testimony placed Petitioner in the victim's house by 11:34 a.m. As explained below, the discrepancy is not significant under the circumstances.

received a call from Darryl Reeves. He told Reeves that the victim was dead. When Reeves asked who shot the victim, Terry replied: "Some n----, man. I'm not really sure. I'm trying to find out now, man." At 2:54 p.m., Terry called Ondaryl Smith and told him: "man, some…n---- named Chrome, man. [The victim] was dealing with the n----, man…this bitch, he's been dealing with him through a bitch, man. N---- killed my [brother]." (*Id.* at pp. 194-97, 289-97; *see also* ECF No. 7 at pp. 11-12.)[10]

Terry identified Petitioner from a photo array on January 14, 2008. He pointed to Petitioner's picture and stated that Petitioner was the one "who killed [the victim.]" (Trial Tr. at pp. 248-50.) Petitioner was arrested in Atlanta, Georgia the following month, and Terry testified at the preliminary hearing held on February 20, 2008.

When he testified at trial, Terry said that on the day of the shooting the victim told him Petitioner was coming to the house to buy drugs. (*Id.* at p. 163.) At some point, Terry testified, he became aware that Petitioner was in the house to make the transaction because he heard the door to the basement close. (*Id.* at p. 166.) Terry said he went to the basement to see what was going on, and as soon as he got to the bottom of the steps he saw Petitioner pointing a gun at the victim and heard the victim telling Petitioner to "just take" the drugs. (*Id.* at p. 170.) Terry testified that he turned to run up the stairs and, when he did so, he heard gunshots. (*Id.* at pp. 169-70.) Terry stated he then ran outside to get his gun, which was hidden in the backyard, and when he was outside he saw the gold Jeep leave the scene. (*Id.* at pp. 171-73.)

---

[10] The recordings of Terry's telephone conversations were played for the jury but were not transcribed as part of the trial transcript. Respondents set forth the relevant text of those conversations in their answer to the habeas petition. (ECF No. 7 at pp. 11-12.) Petitioner does not dispute the accuracy of Respondents' quotations from those conversations.

Terry admitted he did not initially tell the police that Petitioner shot the victim. He also admitted that his trial testimony varied from statements he made in some of the telephone conversations he had following the shooting as well as from his preliminary hearing testimony.[11] (*Id.* at pp. 173-75, 181-83.) He stated that he did not immediately reveal what he witnessed because he did not want to be labeled a "snitch," testify at a trial, or let people know that he did not help his brother. (*Id.* at pp. 173-75, 198.) Terry also stated he did not want the police to find Petitioner before him because he wanted to kill Petitioner in retribution. (*Id.* at p. 188.)

During Terry's cross-examination, trial counsel pursued a line of questioning suggesting that Terry may have killed the victim because he believed the victim was a "snitch." (*Id.* at pp. 184-88.) Terry denied shooting the victim. (*Id.* at p. 188.) When he testified, Det. Mullen stated he never considered Terry a suspect in the murder. (*Id.* at pp. 233-34.)

The victim and Terry's cousin, Leonard, testified that Terry called him after the shooting and that he arrived at the victim's home in his blue SUV about five to six minutes later. (*Id.* at p. 203.) Leonard stated he ran down to the basement to give medical aid to the victim, and that at that time the victim was still conscious and able to speak. (*Id.* at pp. 203-04.) According to Leonard, the victim told him that "Chrome" shot him. (*Id.* at p. 205.) Leonard admitted he did not give law enforcement officials this information until after he was federally indicted on drug charges. (*Id.* at p. 219.)

---

[11] At the February 20, 2008 preliminary hearing, Terry testified he heard gunshots when Petitioner was in the home. (Prelim. Hr'g Tr. at pp. 9-11.) In contrast to his trial testimony, at the preliminary hearing Terry testified he did not enter the basement until after the victim was shot and he did not see Petitioner with a gun. (*Id.* at pp. 11, 15-16.)

Leonard further testified that in March 2009 both he and Petitioner were incarcerated at the Allegheny County Jail.[12] (*Id.* at pp. 207-09.) He said that Petitioner asked him if he knew Terry. (*Id.* at pp. 211-12.) Leonard replied that Terry was his cousin. According to Leonard, Petitioner told him he would pay Terry $10,000.00 if Terry agreed not to testify against him. (*Id.* at pp. 212-14.)

The jury learned that at the time of the trial both Terry and Leonard had charges pending against them in federal court for selling fifty grams to five kilos of drugs and that, if convicted, they faced potentially significant jail sentences. (*Id.* at pp. 160-61, 179, 201-02, 215, 220, 232-33.) Det. Mullen was the lead investigator on the federal case against Leonard and Terry. He testified that no deals or promises were made to them in exchange for their testimony. (*Id.* at pp. 232-33.) Similarly, Terry and Leonard both testified that they had not been offered and deals or promised anything in exchange for their testimony.[13] (*Id.* at pp. 162, 202, 216.) They both admitted they were hoping to get "some leniency" in their federal criminal case in exchange for their cooperation in the prosecution of Petitioner. (*Id.* at pp. 162, 202.)

---

[12] Prior to Leonard's testimony the trial court instructed the jury:

> Ladies and gentlemen, you are going to hear some testimony that the defendant made a statement to this witness while he was incarcerated in the Allegheny County Jail. Please disregard the location of where the statement was allegedly made. The fact that the statement may have been made while the defendant was in the Allegheny County Jail is not any evidence of his guilt. You are to follow my earlier instructions concerning credibility of testimony. Your verdict must be based on fair and rational consideration of all evidence. The location of where this statement may have been made is not of any importance.

(Trial Tr. at p. 208.) In Claim D, Petitioner asserts that this instruction was inadequate because it failed to address the possibility that the jury may infer that he committed other crimes as a result of his incarceration.

[13] Petitioner does not claim that the Commonwealth failed to disclose any promise or deal it made with either Terry or Leonard, or that their testimony was false in this regard.

At the conclusion of the trial, the jury convicted Petitioner of first-degree murder, robbery, and carrying a firearm without a license. The trial court sentenced him to a term of five to twenty years on the robbery conviction to be followed by a term of life imprisonment without parole on the first degree murder conviction.

B.  Direct appeal

Petitioner did not initially file a direct appeal. However, the trial court later reinstated his direct appeal rights *nunc pro tunc* and appointed Attorney Charles Pass to represent him. Petitioner then filed a counseled direct appeal in which he claimed that the jury's verdicts were against the weight of the evidence, and also that his convictions were not supported by sufficient evidence, because Terry and Leonard were not reliable witnesses.[14] (Resp's Ex. 4, ECF No. 7-1 at pp. 34-66.)

The Superior Court of Pennsylvania denied Petitioner's claims on the merits and affirmed his judgment of sentence in *Commonwealth v. Jones*, No. 577 WDA 2011 slip op. (Pa. Super. Ct. Dec. 3, 2012) ("*Jones I*") (Resp's Ex. 5, ECF No. 7-1 at pp. 67-79.) The Pennsylvania Supreme Court denied a petition for allowance of appeal on April 30, 2013. (Resp's Ex. 6, ECF No. 7-2 at p. 3.) Petitioner's judgment of sentence became final on July 30, 2013, which is when the ninety-day time period expired for filing a writ of certiorari with the United States Supreme Court in his direct appeal. *Gonzalez v. Thaler*, 565 U.S. 134, 149-50 (2012) (a judgment becomes final at the conclusion of direct review or the expiration of time for seeking such review); *Swartz v. Meyers*, 204 F.3d 417, 419 (3d Cir. 2000) (same). *See also Jimenez v. Quarterman*, 555 U.S. 113, 121 (2009).

---

[14] Petitioner does not raise these claims in this federal habeas case.

C. PCRA proceeding

On June 6, 2013 (before his judgment of sentence became final), Petitioner filed a *pro se* PCRA motion. (ECF No. 20-2 at pp. 1-67.) Petitioner raised a number of claims in this motion, including that Terry recanted his trial testimony (*id.* at p. 13), which is also the basis of the gateway actual innocence claim he now raises in this habeas case in an attempt to excuse his failure to comply with AEDPA's limitations period. Petitioner attached to his *pro se* PCRA motion Terry's 2013 Affidavit (*id.* at pp. 66-67) and asserted that if the PCRA court scheduled an evidentiary hearing he would call Terry, who was housed at SCI Mahanoy at the time, to testify. (*Id.* at p. 18.)

In Terry's 2013 Affidavit, Terry averred that a "masked assailant" entered the victim's home through a back entrance and went to the basement where Terry and the victim were located. (Pet's Ex. A, ECF No. 1-1 at pp. 80-81, ¶¶ 2-3.) According to Terry, the masked assailant pointed a gun at them and demanded money and drugs. (*Id.* ¶ 3.) Terry "pretended to go get the money" but instead ran out the back door of the house. (*Id.* ¶ 4.) He heard gunshots as he was exiting the house. Terry then turned around and saw the masked assailant chasing him. (*Id.* ¶¶ 5-6.) Terry "got away from" the masked assailant and "later returned to the house" where he found the victim unconscious and bleeding from multiple gunshot wounds. (*Id.* ¶¶ 7-8.)

Terry further averred that he initially believed Petitioner was involved in the robbery because Petitioner was in the house "not long before the shooting" and Terry saw him "get in the gold jeep and drive away[.]" (*Id.* ¶¶ 9-10.) However, because Terry was not "totally sure if [Petitioner] was involved with the shooting" he "did not want to cooperate with the police and testify against [Petitioner] during the early stages of the investigation." (*Id.* ¶ 10.) "[A] few months after the shooting[,]" Terry averred, he "heard through rumors on the street who the Assailant was…but out of fear of another attack on [him] or [his] family by the masked Assailant, [he]

cooperated with the police in prosecuting [Petitioner] for the shooting." (*Id.* ¶ 11.) He also did so because he knew his cooperation would benefit him in his federal criminal case. (*Id.* ¶¶ 12-14.) Terry stated that "he will never tell who the Assailant in the mask was on the day [the victim] was shot out of fear of the Assailant." (*Id.* ¶ 15.)

After Petitioner file his *pro se* PCRA motion the trial court (now the "PCRA court") appointed Attorney Christy P. Foreman ("PCRA counsel") to represent him. Importantly, Petitioner abandoned any claim premised upon Terry's 2013 Affidavit. In his counseled PCRA motion filed in September 2014 (Resp's Ex. 7, ECF No. 7-2 at pp. 4-45), Petitioner raised only the ineffective assistance of trial counsel claims that he also raises in this federal habeas case as Claims A, B and C. (*Id.*; *see also* Resp's Ex. 9, PCRA Ct. Op., ECF No. 7-2 at pp. 64-65) (summarizing Petitioner's PCRA claims).

In support of his ineffective assistance claims, Petitioner presented to the PCRA court Det. Ladley's 2008 Police Report. As previously explained, Det. Ladley wrote in that report that Det. Steckel had informed him that an individual (who was later confirmed to be Petitioner) exited the victim's home at 11:34 a.m. Thus, Petitioner argued, trial counsel should have objected to Det. Hennessey's testimony that he left the scene at 11:38 a.m. (Claim B.) Petitioner further argued that trial counsel should have called Det. Steckel as a defense witness to demonstrate that Petitioner left the victim's home at 11:34 a.m. (Claim A.) Had trial counsel done these things, Petitioner contended, the defense could have established Petitioner was not in the victim's home at the time of the shooting since Burwell allegedly placed the 911 call at 11:42 a.m., eight minutes after Det. Steckel saw Petitioner leave. Petitioner asserted that Burwell would not have waited that amount of time to call 911.

Petitioner also argued to the PCRA court that trial counsel should not have stipulated to the authenticity of the victim's phone cellphone records. (Claim C.) Trial counsel should not have done so, Petitioner maintained, because the phone records, which indicated that he called the victim from Green's cellphone at 11:36 a.m., were in direct contradiction to the information contained in Det. Ladley's 2008 Report that he left the victim's home two minutes earlier, at 11:34 a.m. Therefore, Petitioner argued, the cellphone records may have been altered.

After Petitioner's counseled PCRA motion was filed, Petitioner filed a *pro se* supplement within which he raised an additional claim for relief—that trial counsel was ineffective for stipulating to Green's cellphone number.[15] The PCRA court permitted Petitioner to supplement his counseled PCRA motion in this manner. (*See* Resp's Ex. 9, PCRA Ct. Op., ECF No. 7-2 at pp. 64-65, 69). Importantly, Petitioner did not advise the PCRA court that he believed he had a viable claim premised upon Terry's 2013 Affidavit that he also wanted to litigate.

The PCRA court held an evidentiary hearing on May 7, 2015 at which trial counsel and Petitioner testified. Petitioner did not mention Terry's 2013 Affidavit when he testified at that hearing or otherwise indicate he was innocent because Terry had recanted his trial testimony almost two years earlier in that affidavit.

During his PCRA testimony, trial counsel was asked to discuss his trial strategy and explain why he did not object to Det. Hennessey's timeline testimony or call Det. Steckel as a defense witness. In response, trial counsel noted the strength of the Commonwealth's evidence establishing that Petitioner was at the victim's house to carry out a drug deal in close proximity to the time of the shooting. (PCRA Hr'g Tr. at p. 6.) He also explained that he did not pursue a strategy focused

---

[15] Neither party electronically filed Petitioner's supplement to the counseled PCRA motion. It is contained in the original state court records Respondents submitted to the Court.

on attempting to set forth a minute-by-minute timeline for when events occurred *because the exact time of the shooting could not be established*. Thus, under the circumstances, whether Petitioner exited the victim's home at 11:34 a.m. instead of 11:38 a.m. was not significant. (*Id.* at pp. 6-7, 10-12, 17.)

Trial counsel further testified that he met with Petitioner numerous times prior to the trial and reviewed the evidence. They agreed that the defense would attempt to create reasonable doubt in the mind of the jurors by suggesting that Terry shot the victim following an argument because Terry believed the victim was "a snitch." (*Id.* at pp. 7-12, 16, 19-22.) In fact, trial counsel stated, Petitioner was planning to testify about what he witnessed when he was in the victim's home to support this defense theory. However, Petitioner changed his mind during the course of the trial and, despite trial counsel's contrary advice, he decided not to testify. (*Id.* at pp. 9-10, 21-22.) Trial counsel also explained that he did not deem it worthwhile to contest the authenticity of the victim's cellphone records given the strength of the Commonwealth's other evidence—including the surveillance video, fingerprint evidence, and Green's January 13, 2008 statement to the police— that established that Petitioner was at the scene of the crime during the relevant time period. (*Id.* at pp. 13-17, 24.)

During his PCRA testimony, Petitioner did not dispute that he was at the victim's house just prior to the shooting. He maintained that he left minutes before it occurred. (*Id.* at pp. 27-28.) Petitioner also acknowledged that he intended to testify at trial to support the defense theory that Terry shot the victim following an argument, but that he changed his mind during the course of the trial. (*Id.* at pp. 29-30.)

Following the hearing, the PCRA court denied Petitioner post-conviction relief and Petitioner filed a counseled appeal to the Superior Court. The PCRA court then issued its Appellate

Rule 1925(a) opinion explaining why it denied Claims A, B and C. (Resp's Ex. 9, PCRA Ct. Op., ECF No. 7-2 at pp. 56-71.)

Ineffective assistance of counsel claims are governed by the familiar standard set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance under *Strickland*, the petitioner has the burden of establishing that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. *Strickland* also requires that the petitioner demonstrate that he was prejudiced by his trial counsel's alleged deficient performance. This places the burden on the petitioner to establish "that there is a reasonable probability that, but for counsel's unprofessional errors," the result of his trial "would have been different." *Strickland*, 466 U.S. at 694. The PCRA court applied the *Strickland* standard when it evaluated Petitioner's claims.[16] (Resp's Ex. 9, PCRA Ct. Op., ECF No. 7-2 at pp. 65-66.)

The PCRA court rejected the premise of Claims A, B and C, which was that trial counsel could have created reasonable doubt in the mind of the jurors if he had demonstrated Petitioner left the victim's home at 11:34 a.m. The PCRA court explained:

> Initially, it should be noted that Petitioner's argument is premised on an assumption that is not supported by the record. Petitioner's argument relies on a finding that the shooting took place *immediately* before the 911 call was made and that the 911 call was made at 11:42 a.m. The record establishes that Officer Hess did not testify that the call was made at exactly 11:42 a.m. Instead, his testimony was very clear that the time that he gave for the 911 call was an approximation within a minute or so. In addition, it is also clear that Petitioner's contention that

---

[16] Pennsylvania courts typically articulate *Strickland*'s standard in three parts, while federal courts set it out in two. The legal evaluation is the same, and the differences merely reflect a stylistic choice on the part of state courts. *See, e.g. Commonwealth. v. Mitchell*, 105 A.3d 1257, 1266 (Pa. 2014) ("this Court has divided [*Strickland*'s] performance component into sub-parts dealing with arguable merit and reasonable strategy. Appellant must, therefore, show that: the underlying legal claim has arguable merit; counsel had no reasonable basis for his act or omission; and Appellant suffered prejudice as a result."); *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1117-18 (Pa. 2012) ("In order to obtain relief on a claim of ineffectiveness, a PCRA petitioner must satisfy the performance and prejudice test set forth in Strickland[.]"); *Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987).

the record established that Dominique Burwell made the 911 call *immediately* after the shooting is also inaccurate.

(*Id.* at p. 66) (emphasis supplied by PCRA court.) The PCRA court quoted portions of Burwell's trial testimony in support of its conclusion that "the evidence does not establish that [she] made the 911 call immediately after the shooting." (*Id.* at pp. 66-67.)

The PCRA court further explained:

Given the approximation of the time when the 911 call was received by the police and the fact that the evidence establishes that there was some time that intervened between the shooting and the time that Burwell made the call, Petitioner has failed to demonstrate that trial counsel's failure to object to either the testimony concerning the timeline or the phone records would have affected the outcome of the trial. Petitioner argues that if Detective Steckel had been called to testify his testimony would have established conclusively that Petitioner exited the residence at 11:34 a.m., eight minutes before the shooting and, therefore, someone else had to do the shooting.[3] However, there is no conclusive evidence as to exactly when the shooting took place, given the evidence that certainly some time elapsed between the shooting and the 911 call and the approximation of when the 911 call was received. Even assuming it was established exactly when the 911 call was received by reference to the phone records, there was still an undetermined time gap between the time of the shooting and the time Burwell placed the call. Therefore, given that Petitioner was identified by [Terry] as being in the residence, there is no reasonable probability that the outcome of the trial would have been different if it was shown that the time between [when] Petitioner left the residence and the 911 call was eight minutes, as opposed to four minutes, or something in between.

[3] The evidence established that no one else was seen entering or leaving the residence from the time Petitioner exited the residence and left in the gold Jeep and the time the local police responded to the scene.

- - -

As to Petitioner's claim that counsel was ineffective for failing to object to the phone records, Petitioner has also failed to establish that he was prejudiced by the admission of the records. At the PCRA hearing, Petitioner testified that the phone records were in direct contradiction to the information contained in [Det. Ladley's January 14, 2008 Police Report] indicat[ing] that Detective Steckel's notes stated that a person exited the residence at 11:34 a.m. as opposed to the phone records which the Commonwealth argued established that Petitioner was still outside the residence at 11:36 a.m. This discrepancy does not establish that the phone records were manipulated. Instead, this evidence establishes only that there were inconsistencies between the timekeeping devices, log clocks or watches that

were being used to record the events that day. Only if the exact sequence of events in the house after the shooting could be established, as well as the exact time between the shooting and the 911 call, would the exact time when Petitioner exited the house be of any importance. In addition, the stipulation to Green's cell phone number was not prejudicial. The evidence establishes that the investigating detectives took possession of Green's cell phone and obtained the pertinent records regarding the phone calls made that day. There is no reasonable probability that the stipulation regarding the cell phone number had any effect on the outcome of the trial.

(*Id.* at pp. 67-69.)

At the conclusion of its opinion, the PCRA court held that it credited trial counsel's testimony that he met with Petitioner numerous times prior to the trial and they agreed to pursue the strategy that would suggest that Terry shot the victim and that Petitioner would testify to support this defense. (*Id.* at pp. 69-70.) The PCRA court concluded trial counsel:

pursued a reasonable strategy that included questioning the timeline, but not premising the entire defense on it, given the uncertainties of establishing facts sufficient to establish a certain timeline. Counsel reasonably believed that [Petitioner] would testify concerning an argument between the victim and his brother which would be direct evidence to support the argument that it was the brother who was the killer. Absent Petitioner's testimony, counsel was left to make that argument based on circumstantial evidence and, yet, still argue that Petitioner left the residence four minutes before the shooting occurred. Based on all the foregoing there is no evidence to find that trial counsel was ineffective[.]

(*Id.* at pp. 70-71.)

The Superior Court affirmed the PCRA court's decision in *Commonwealth v. Jones*, No. 865 WDA 2015, slip op. (Pa. Super. Ct. July 25, 2016) ("*Jones II*"). (Resp's Ex. 11, ECF No. 7-3 at pp. 53-60.) It held that the PCRA court's "opinion comprehensively discusses and properly disposes of the questions presented[,]" and denied Claims A, B and C for the reasons given by the PCRA court in its opinion. (*Id.* a pp. 58-59.)

Petitioner filed a petition for allowance of appeal, which the Pennsylvania Supreme Court denied on November 30, 2016. (Resp's Ex. 12, ECF No. 7-3 at p. 63.) He did not file a petition for a writ of certiorari with the Supreme Court.

D. <u>Federal habeas case</u>

Petitioner filed his habeas petition with this Court on August 13, 2019, the date he placed it in the prison mailing system. (ECF No. 1 at p. 15.) Petitioner identified his claims, and set forth the factual and legal support for them, in the fifty-four-page memorandum of law he filed contemporaneously with his habeas petition. (ECF No. 1-1.) As set forth above, Petitioner raises the three claims of trial counsel's ineffectiveness that he also litigated in his PCRA proceeding (Claims A, B and C). He also raises three claims of trial counsel's ineffectiveness (Claims D, E and F), which he did not litigate in state court. (ECF No. 1-1 at pp. 49-78.)

In their answer (ECF No. 7), Respondents contend that the Court must deny all of Petitioner's claims because they are time-barred under AEDPA's statute of limitations and the alleged new evidence he submits in support of his gateway actual innocence claim falls short of that which is required to excuse his failure to comply with the limitations period. Respondents further contend that Petitioner procedurally defaulted Claims D, E and F. Finally, Respondents assert that none of Petitioner's habeas claims have merit.

Petitioner filed a reply (ECF No. 20), in which he asserts that his alleged new evidence is sufficient to excuse his failure to comply with AEDPA's limitations period. He also assert that he is entitled to an evidentiary hearing.

III.    **Discussion**

A. <u>Jurisdiction</u>

The Court has jurisdiction under 28 U.S.C. § 2254, the federal habeas statute applicable to prisoners in custody pursuant to a state-court judgment. It permits a federal court to grant a state prisoner a writ of habeas corpus "on the ground that he or she is in custody in violation of the Constitution…of the United States." 28 U.S.C. § 2254(a). Errors of state law are not cognizable.

*Id.*; *see, e.g., Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). It is Petitioner's burden to prove that he is entitled to the writ. *See, e.g., Vickers v. Sup't Graterford SCI*, 858 F.3d 841, 848-49 (3d Cir. 2017).

In 1996, Congress made significant amendments to the federal habeas statutes with the enactment of AEDPA, which "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)). AEDPA reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (internal quotations and citation omitted). As discussed in more detail below, among other things, AEDPA imposes a one-year limitations period for state prisoners seeking federal habeas review, 28 U.S.C. § 2244(d), and prohibits a district court from conducting an evidentiary hearing in some circumstances, *id.* § 2254(e)(2).

B.  Standard of Review

A finding of fact made by a state court, including credibility determinations, always has been afforded considerable deference in a federal habeas proceeding. *Vickers*, 858 F.3d at 850 (even in pre-AEDPA cases, "'federal habeas courts [had] no license to redetermine credibility of witnesses who demeanor ha[d] been observed by the state trial court, but not by them'") (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). AEDPA continued that deference and mandates that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*

AEDPA also put into place a new standard of review, which is codified at 28 U.S.C. § 2254(d). In this case, it applies "to any claim that was adjudicated on the merits" by the state court[17] and it prohibits a federal habeas court from granting relief unless the petitioner established that the state court's "adjudication of the claim":

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). For the purposes of § 2254(d), a claim has been "adjudicated on the merits in State court proceedings" when the state court made a decision that finally resolves the claim based on its substance, not on a procedural, or other, ground. *See, e.g., Richter*, 562 U.S. at 98-100; *Robinson v. Beard*, 762 F.3d 316, 324 (3d Cir. 2014).

Section 2254(d)(1) applies to questions of law and mixed questions of law and fact. In applying it, this Court's first task is to ascertain what law falls within the scope of the "clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1). It is "'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'" *Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 280 (2016) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)).

Once the "clearly established Federal law, as determined by the Supreme Court of the United States," is ascertained, this Court must determine whether the state court's adjudication of

---

[17] When applying AEDPA's standard of review at § 2254(d), the federal habeas court considers the "last reasoned decision" of the state courts. *Simmons v. Beard*, 590 F.3d 223, 231-32 (3d Cir. 2009) (quoting *Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008)); *Brown v. Sup't Greene SCI*, 834 F.3d 506, 512 (3d Cir. 2016). Thus, when this Court's reviews Claims A, B and C under § 2254(d), it looks to the PCRA court's disposition of those claims, which was adopted in full by the Superior Court in *Jones II*.

the claim at issue was "contrary to" that law. *Williams*, 529 U.S. at 404-05 (explaining that the "contrary to" and "unreasonable application of" clauses of § 2254(d)(1) have independent meaning). A state-court adjudication is "contrary to…clearly established Federal law, as determined by the Supreme Court of the United States" § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," *Williams*, 529 U.S. at 405, or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent," *id.* at 406.

A "run-of-the-mill" state-court adjudication applying the correct legal rule from Supreme Court decisions to the facts of a particular case will not be "contrary to" Supreme Court precedent. *Williams*, 529 U.S. at 406. Therefore, the issue in most federal habeas cases is whether the adjudication by the state court survives review under § 2254(d)(1)'s "unreasonable application" clause.

"A state court decision is an 'unreasonable application of federal law' if the state court 'identifies the correct governing legal principle,' but 'unreasonably applies that principle to the facts of the prisoner's case.'" *Dennis*, 834 F.3d at 281 (quoting *Williams*, 529 U.S. at 413). To satisfy his burden under this provision of AEDPA's standard of review, Petitioner must do more than convince this Court that the state court's decision was incorrect. *Id.* He must show that it "'was *objectively* unreasonable.'" *Id.* (quoting *Williams*, 529 U.S. at 409) (emphasis added by *Dennis*). This means that Petitioner must demonstrate that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. As the Supreme Court noted:

It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *See Lockyer, supra*, at 75, 123 S. Ct. 1166. If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further.

*Id.* at 102.

The standard of review set forth at § 2254(d)(2) applies when a petitioner "challenges the factual basis for" the state court's "decision rejecting a claim[.]"[18] *Burt v. Titlow*, 571 U.S. 12, 18 (2013). "[A] state court decision is based on an 'unreasonable determination of the facts' if the state court's factual findings are 'objectively unreasonable in light of the evidence presented in the state-court proceeding,' which requires review of whether there was sufficient evidence to support the state court's factual findings." *Dennis*, 834 F.3d at 281 (quoting § 2254(d)(2) and citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Titlow*, 571 U.S. at 18 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)); *see Rice v. Collins*, 546 U.S. 333, 342 (2006) (reversing court of appeals's decision because "[t]he panel majority's attempt to use a set of debatable inferences to set aside the conclusion reached by the state court does not satisfy AEDPA's requirements for granting a writ of habeas corpus."). Thus, "if '[r]easonable minds reviewing the record might disagree' about the finding in question,

---

[18] Sections 2254(d)(2) and (e)(1) "express the same fundamental principle of deference to state court findings[,]" and federal habeas courts "have tended to lump the two provisions together as generally indicative of the deference AEDPA requires of state court factual determinations." *Lambert*, 387 F.3d at 235. The Court of Appeals has instructed that § 2254(d)(2), when it applies, provides the "overarching standard" that a petitioner must overcome to receive habeas relief, while 2254(e)(1) applies to "specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision." *Id.*

'on habeas review that does not suffice to supersede'" the state court's adjudication. *Wood*, 558 U.S at 301 (quoting *Collins*, 546 U.S. at 341-42).

C. Exhaustion and Procedural Default

The "exhaustion doctrine" requires that a state prisoner raise his federal constitutional claims in state court through the proper procedures before he litigates them in a federal habeas petition. *See, e.g., Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997). It is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). It "is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts[.]" *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). A petitioner must have "invoke[d] one complete round of the State's established appellate review process[,]" in order to satisfy the exhaustion requirement. *Id.* In Pennsylvania, this requirement means that a petitioner in a non-capital case must have first presented every federal constitutional claim raised in his federal habeas petition to the Superior Court either on direct or PCRA appeal. *See, e.g., Lambert v. Blackwell*, 387 F.3d 210, 233-34 (3d Cir. 2004).

The doctrine of procedural default, like the doctrine of exhaustion, is "grounded in concerns of comity and federalism," *Coleman*, 501 U.S. at 730. In those instances in which the Superior Court did not adjudicate one of Petitioner's habeas on the merits, this Court must determine whether that was because Petitioner procedurally defaulted it because he did not raise it to the Superior Court. To succinctly summarize the procedural default doctrine, it provides that a Pennsylvania state prisoner in a non-capital case defaults a federal habeas claim if he: (a) failed to present it to the Superior Court and cannot do so now because the state courts would decline to

address the claims on the merits since state procedural rules (such as, for example, the PCRA's one-year statute of limitations or waiver rules) bar such consideration; or (b) failed to comply with a state procedural rule when he presented the claim to the state court, and for that reason, the Superior Court declined to address the federal claim on the merits. *See, e.g., Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *O'Sullivan v. Boerckel*, 526 U.S. 838, 851-56 (1999) (Stevens, J. dissenting) (describing the history of the procedural default doctrine); *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Lines v. Larkins*, 208 F.3d 153, 162-69 (3d Cir. 2000).

If the claim is not defaulted, or if the petitioner has established grounds to excuse his default, the standard of review at § 2254(d) does not apply and the Court reviews the claim *de novo*. *See, e.g., Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). However, in all cases and regardless of whether the standard of review at § 2254(d) applies, the state court's factual determinations are presumed to be correct under § 2254(e)(1) unless the petitioner rebuts that presumption by clear and convincing evidence. *Palmer v. Hendricks,* 592 F.3d 386, 392 (3d Cir. 2010); *Nara v. Frank*, 488 F.3d 187, 201 (3d Cir. 2007) ("the § 2254(e)(1) presumption of correctness applies regardless of whether there has been an 'adjudication on the merits' for purposes of § 2254(d).") (citing *Appel*, 250 F.3d at 210).

D.  Petitioner's Habeas Claims Are Time-barred

With respect to the statute of limitations, AEDPA requires, with a few exceptions not applicable here, that a state prisoner's habeas claims be filed within one year of the date the petitioner's judgment of sentence became final. *Id.* § 2244(d)(1)(A). It also provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." *Id.* § 2244(d)(2).

Petitioner's judgment of sentence became final on July 30, 2013. His PCRA proceeding was pending on that date and, therefore, AEDPA's statute of limitations was immediately statutorily tolled pursuant to § 2244(d)(2). Petitioner's PCRA proceeding remained pending through November 30, 2016, which is the date the Pennsylvania Supreme Court denied him a petition for allowance of appeal from the Superior Court's decision in *Jones II*. *Lawrence v. Florida*, 549 U.S. 327, 331-36 (2007) (a petitioner is not entitled to statutory tolling for the period available to file a petition for writ of certiorari to the United States Supreme Court following state collateral review).

AEDPA's limitations period began to run again the next day, on December 1, 2016. Therefore, Petitioner had one year from that date to file timely habeas claims with this Court. Since he did not file his habeas petition until August 13, 2019, he filed his habeas claims more than one years and eight months after AEDPA's limitation period expired for all claims. Accordingly, Petitioner's habeas claims (Claim A through F) are time-barred.

Petitioner concedes that his habeas claims are untimely but asserts that the Court must excuse his failure to comply with AEDPA's limitations period because he is innocent. In *McQuiggin*, the Supreme Court recognized that the actual-innocence "gateway" to federal habeas review developed in *Schlup v. Delo*, 513 U.S. 298 (1995) for procedurally defaulted claims extends to cases where a petitioner's claims would otherwise be barred by the expiration AEDPA's one-year statute of limitations.[19] In *Schlup*, the Supreme Court held that a viable claim of actual innocence requires a petitioner "to support his allegations of constitutional error with new reliable

---

[19] The Supreme Court also has held that AEDPA's limitations period "is subject to equitable tolling in appropriate cases." *Holland v. Florida*, 560 U.S. 631, 645 (2010). A petitioner is entitled to equitable tolling only if he shows both that: (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented timely filing. *Id.* at 649. Petitioner does not argue that he is entitled to equitable tolling.

evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." 513 U.S. at 324. Importantly, "'[a]ctual innocence' means factual innocence, not mere legal insufficiency." *Sistrunk v. Rozum*, 674 F.3d 181, 191 (3d Cir. 2012) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

The Supreme Court's ruling in *McQuiggin* was "grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." 569 U.S. at 392-93 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)). It held that the "actual innocence" exception will apply only to a "severely confined category" of cases,*" id.* at 395, and instructed "[t]he gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *Id.* at 401 (quoting *Schlup*, 513 U.S. at 316).

In *Reeves v. Fayette SCI*, 897 F.3d 154 (3d Cir. 2018), the Court of Appeals explained:

> To satisfy this standard, first, "a petitioner must present *new, reliable evidence*" and second, "show by a preponderance of the evidence 'that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence,'" *Houck v. Stickman*, 625 F.3d 88, 93 (3d Cir. 2010) (citing and quoting *Schlup*, 513 U.S. at 324, 327, 115 S. Ct. 851), or stated differently, that it is "more likely than not any reasonable juror would have reasonable doubt," *House v. Bell*, 547 U.S. 518, 538, 126 S. Ct. 2064, 165 L.Ed.2d 1 (2006). *As part of the reliability assessment of the first step, the court "may consider how the timing of [the petitioner's] submission and the likely credibility of the [witnesses] bear on the probable reliability of that evidence," as well as the circumstances surrounding the evidence and any supporting corroboration. Id.* at 537, 551, 126 S. Ct. 2064 (internal quotation marks and citation omitted); *see also McQuiggin*, 569 U.S. at 399, 133 S. Ct. 1924.
>
> In evaluating the second step—whether it is more likely than not no reasonable juror would convict the petitioner—the court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 538, 126 S. Ct. 2064 (internal quotation marks and citation omitted). "[M]ere impeachment evidence is generally not sufficient to satisfy the [gateway actual innocence] standard." *Munchinski v. Wilson*, 694 F.3d

308, 338 (3d Cir. 2012). However, new, reliable evidence that "undermine[s] the [trial] evidence pointing to the identity of the [perpetrator] and the motive for the [crime]" can suffice to show actual innocence. *Goldblum v. Klem*, 510 F.3d 204, 233 (3d Cir. 2007); *see also Munchinski*, 694 F.3d at 336-37 (explaining that actual innocence was demonstrated where new evidence both showed that the crime could not have happened in the way the Commonwealth presented at trial and provided an alternative theory that was more appropriate and better fit the facts of the case). In weighing the evidence, "[t]he court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors"; the actual innocence standard "does not require absolute certainty about the petitioner's guilt or innocence." *House*, 547 U.S. at 538, 126 S. Ct. 2064.

*Id.* at 160-61 (bracketed text in *Reeves*) (emphasis added).

In support of Petitioner's gateway actual innocence claim, he relies upon Terry's 2013 Affidavit within which Terry recanted his 2010 trial testimony. Respondents do not dispute that this evidence is "new" in the sense that it did not become available to Petitioner until after his trial. Rather, they assert that this evidence is not *reliable*, and note that "[c]ourts have historically viewed recantation with great suspicion." *Landano v. Rafferty*, 856 F.2d 569, 572 (3d Cir. 1988).

The Court of Appeals recently explained:

As a general matter, a recantation in the absence of corroborating evidence or circumstances will probably fall short of the standard of reliability contemplated by *Schlup*. But that does not mean that recantation evidence is to be categorically rejected. On the contrary, "there is no categorical limits on the types of evidence that can be offered under *Schlup*. *Hyman v. Brown*, 927 F.3d 639, 660 (2d Cir. 2019). Like any other form of evidence, recantations should be analyzed on an individual and fact-specific basis, taking into account the non-exclusive factors outlined in *Reeves*.

*Howell v. Sup't Albion SCI*, 978 F.3d 54, 60 (3d Cir. 2020).

The Court has evaluated Petitioner's recantation evidence under this standard and has concluded that it is not reliable evidence that Petitioner is innocent. As the Court of Appeals observed in *Reeves*, the federal habeas court may take into account how the timing of the claim bears on the reliability of the "new" evidence. 897 F.3d at 161. Here, Petitioner abandoned any claim premised upon Terry's 2013 Affidavit by September 2014 when his amended PCRA motion

was filed. He did not raise any claim premised upon that affidavit until he filed his federal habeas petition with this Court almost five years later, in August 2019.

Petitioner and his counsel's abandonment of his recantation clam in his PCRA proceeding cuts against the reliability of the averments made in Terry's 2013 Affidavit. The logical inference to be drawn from Petitioner and PCRA counsel's decision to abandon the claim is that further investigation revealed to them that Terry's recantation was not trustworthy. Notably, Petitioner does not direct the Court to any evidence indicating that he complained to the PCRA court when counsel decided not to include a claim premised upon Terry's 2013 Affidavit in the amended PCRA motion. The subsequent *pro se* supplement Petitioner filed with the PCRA court evidences he agreed with his counsel's decision.[20] In it, Petitioner advised the PCRA court that he wanted to litigate the claim that trial counsel was ineffective for stipulating to Green's cellphone number. He did not also indicate he had a viable claim that Terry recanted his trial testimony that PCRA counsel was failing to raise.

The averments Terry made in his affidavit—that a masked intruder entered the house through a back door, shot the victim, then followed Terry outside and chased him—are not reliable for the additional reason that those averments are not corroborated by the surveillance evidence. That video surveillance evidence demonstrates that Petitioner was the only person observed entering or exiting the house around the time of the shooting. (Trial Tr. at pp. 86-87.) That evidence

---

[20] Although Petitioner in his habeas petition includes the boilerplate assertion that PCRA counsel was ineffective (*see* ECF No. 1 at pp. 5, 12), he does not repeat that assertion in the memorandum of law he filed in support of his petition or provide any factual or legal support for it. Similarly, Petitioner did not argue in his reply (ECF No. 20) that PCRA counsel was ineffective. The Supreme Court has emphasized that counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment[.]" *Strickland*, 466 U.S. at 689. It is Petitioner's burden to establish that his PCRA counsel provided him with ineffective assistance, *id.* at 688, and he has not met his burden in this case.

does not support Terry's 2013 averments that a masked assailant entered the house through a rear entrance and chased him outside after the shooting. In contrast, Terry's contemporaneous statements that Petitioner was the shooter is consistent with the surveillance evidence. For example, Terry told the officers who arrived at the scene shortly after the murder that the shooter left in a gold Jeep. That is consistent with the surveillance video, which once again evidences that Petitioner was the only individual who left the scene around the time of the shooting, and that he did so in a gold Jeep. Terry's contemporaneous statements to the police are also consistent with the statement he made to his girlfriend, Burwell, after the shooting when he told her that Petitioner shot the victim. (*Id.* at p. 136.) Similarly, Terry identified Petitioner as the shooter in some of the telephone calls he conducted the afternoon of January 13, 2008, before he knew that his calls were being recorded by investigators. (*See* ECF No. 7 at pp. 11-2.) He also identified Petitioner as the shooter from a photo array shown to him the day after the shooting, on January 14, 2008. (Trial Tr. at p. 248-50.)

To the extent that Petitioner asserts that Det. Ladley's 2008 Police Report bolsters the reliability of the Terry's June 2013 Affidavit, that assertion also is unconvincing. The police report evidences that Petitioner may have left the victim's home at 11:34 a.m. instead of 11:38 a.m., but it does not corroborate Terry's averment that a masked assailant entered the victim's home through a rear entrance, shot the victim, then followed Terry out the back door and chased him. Additionally, the police report itself is not evidence of Petitioner's factual innocence since the exact time the shooting occurred was not established. Thus, Petitioner could have shot the victim even if he left the home at 11:34 a.m.

Based upon the forgoing, Petitioner has not demonstrated that this is one of the rare cases where the actual innocence exception to the statute of limitations recognized by *McQuiggin*

applies. Therefore, his habeas claims (Claims A through F) are time-barred and the Court will deny them for that reason.

      E.  <u>Petitioner's Habeas Claims Are Denied for Additional Reasons</u>

      Even if the Court excused Petitioner's failure to comply with AEDPA's limitations period under *McQuiggin*, he still would not be entitled to habeas relief. Because the state court denied Claims A, B and C on the merits, this Court must apply AEDPA's standard of review to them. Petitioner has not demonstrated that the state court's decision to deny Claims A, B or C was "contrary to, or an unreasonable application of" *Strickland* or any other "clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[,]" *id.* § 2254(d)(2). In addition, he has not rebutted the PCRA court's findings of fact by "clear and convincing evidence." 28 U.S.C. § 2254(e). For these reasons, Claims A, B and C are denied on the merits.

      As for Claims D, E and F, Petitioner procedurally defaulted them because he did not litigate them in state court. A petitioner may overcome his default of a claim if he presents new reliable evidence of his innocence, which is the same way a petitioner can be excused from compliance with AEDPA's limitations period. *McQuiggin*, 513 U.S. at 324; *Schlup*, 513 U.S. at 316.[21] The Court has already explained that Petitioner's alleged new evidence of innocence is insufficient to

---

[21] When a claim is procedurally defaulted, a petitioner also can overcome the default if he demonstrates "cause for the default and actual prejudice as a result of the alleged violation of federal law[.]" *Coleman*, 501 U.S. at 750. *See also Martinez v. Ryan*, 566 U.S. 1 (2012), "'Cause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot fairly be attributed to him[.]" *Id.* at 753 (emphasis in original). Petitioner does not argue that he can demonstrate "cause" and "prejudice" to excuse his default.

provide him with the "gateway" to litigate his otherwise barred habeas claims. Accordingly, there are no grounds to excuse Petitioner's default of Claim D, E and F.

However, the Court would deny Claims D, E and F on the merits even if it reviewed them *de novo*. Petitioner has not demonstrated that there is a reasonable probability that the outcome of his trial would have been different if trial counsel had requested another jury instruction to cure the alleged "taint" of Leonard's testimony about the jailhouse conversation (Claim D) or a *crimen falsi* instruction with respect to Terry's testimony (Claim E). Therefore, Petitioner was not prejudiced by trial counsel's alleged deficient performance. Nor has Petitioner demonstrated that when considered cumulatively, any alleged errors on the part of trial counsel entitle him to habeas relief (Claim F.)

Based upon the forgoing, in addition to being untimely, Claims A, B and C also are denied on the merits because the state court's adjudication of them withstands AEDPA's standard of review. Claims D, E and F, in addition to being untimely and defaulted, are denied because they have no merit.

### F.  Petitioner Is Not Entitled to Habeas Relief on a Freestanding Actual Innocence Claim

To the extent that Petitioner is also raising a *freestanding* actual innocence claim (in addition to his *gateway* actual innocence claim), that claim is denied. In the Third Circuit, "[i]t has long been recognized that '[c]laims of actual innocence based on only newly discovered evidence' are never grounds for 'federal habeas relief absent an independent constitutional violation.'" *Fielder v. Varner*, 379 F.3d 113, 122 (3d Cir. 2004) (quoting *Herrera v. Collins*, 506 U.S. 390, 400 (1993));[22] *Albrecht v. Horn*, 485 F.3d 103, 121-22 (3d Cir. 2007). However, the Court of

---

[22] In *Herrera*, the Supreme Court left open the possibility that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant *Footnote continue on next page…*

Appeals has acknowledged that the Supreme Court has yet to definitely resolve the issue. *Reeves*, 387 F.3d at 160 n.4. The Court of Appeals has further explained that to the extent freestanding actual innocence claims are cognizable, they must be "assessed under a more demanding standard [than a gateway actual innocence claim], since the petitioner's [freestanding] claim is that his conviction is constitutionally impermissible 'even if his conviction was the product of a fair trial[.]'" *Id.* (quoting *Schlup*, 513 U.S. at 316 and citing *House v. Bell*, 547 U.S. 518, 555 (2006)).

Suffice it to say that if indeed a freestanding claim of actual innocence could be brought in a non-capital federal habeas case such as this one, Petitioner has fallen short of offering the type of evidence of innocence that would entitle him to habeas relief on such a claim given that he has not satisfied the lesser (although still demanding) standard that applies to gateway actual innocence claims.

Accordingly, if Petitioner is raising a freestanding actual innocence claim it is denied.

G. Petitioner's Request for an Evidentiary Hearing Is Denied

Petitioner contends that he is entitled to an evidentiary hearing on all claims. Section § 2254(e)(2), as amended by AEDPA, provides:

> *If the applicant has failed to develop the factual basis of a claim in State court proceedings*, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>
> (A)     the claim relies on--
>
>     (i)        a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
>     (ii)       a factual predicate that could not have been previously discovered through the exercise of due diligence; and

---

unconstitutional, and warrant federal habeas relief if there was no state avenue open to process such a claim." 506 U.S. at 417.

(B)      the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

(Emphasis added).

"Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). *See, e.g., Han Tak Lee v. Glunt*, 667 F.3d 397, 406 (3d Cir. 2012); *Palmer*, 592 F.3d at 392-93. "Diligence…depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.* at 435.

When an evidentiary hearing is not prohibited by § 2254(e)(2), it is within the district court's discretion whether to hold one. *See, e.g., Schriro v. Landrigan*, 550 U.S. 465, 473-75 (2007); *Han Tak Lee*, 667 F.3d at 406; *Palmer*, 592 F.3d at 393-95. In deciding whether to exercise that discretion, the district court "'must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Palmer*, 592 F.3d at 393 (quoting *Landrigan*, 550 U.S. at 474).

"[B]ald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing." *Campbell v. Burris*, 515 F.3d 172, 184 (3d Cir. 2008) (quoting *Mayberry v. Petso*ck, 821 F.2d 179, 185 (3d Cir. 1987)). Moreover, "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Palmer*, 592 F.3d at 393 (citing *Landrigan*, 550 U.S. at 474). "That is, even if the factual allegations in the habeas petition are sufficient to make out a prima facie claim for habeas relief, a district court may decline to convene an evidentiary hearing if the factual allegations are 'contravened by the existing record.'" *Id.* (citation omitted).

Here, even if the Court excused Petitioner's failure to comply with AEDPA's limitations period under *McQuiggin*, he would still not be entitled to an evidentiary hearing on any of his habeas claims (Claims A through F). Because the state court adjudicated Claims A, B and C on the merits, this Court's review of them is limited to the record that was before the state court and Petitioner cannot introduce additional evidence to support them. 28 U.S.C. § 2254(d)(2) (inquiry when this subsection of AEDPA's standard of review applies is limited to "the evidence presented in the State court proceeding."); *Cullen v. Pinholster*, 563 U.S. 170, 180-86, and 185 n.7 (2011) (review under § 2254(d)(1), like that under § 2254(d)(2), is limited to the state court record).

As for Claims D, E and F, Petitioner was not diligent in developing evidence to support them because he did not raise them in his PCRA proceeding. Therefore, the Court is barred from conducting an evidentiary hearing on those claims under § 2254(e)(2). In any event, no hearing is required on Claims D, E and F because they can be disposed of on the merits by the evidence that is contained in the state court record.

To the extent that Petitioner is raising a *freestanding* claim of actual innocence, he is not entitled to an evidentiary hearing on that claim either. The Court has explained that Supreme Court has not definitively resolved whether freestanding claims of actual innocence are cognizable in a federal habeas case. If such claims are cognizable, the Court is nevertheless prohibited from conducting an evidentiary hearing on such a claim in this case because Petitioner was not diligent in developing evidence to support it in state court. Therefore, § 2254(e)(2) applies and Petitioner has not satisfied the criteria set forth in § 2254(e)(2)(A) and (B). As a result, the Court may not conduct an evidentiary hearing on a freestanding actual innocence claim in this case. *See, e.g., Lewis v. Horn*, 581 F.3d 92, 105 (3d Cir. 2009) (petitioner not entitled to an evidentiary hearing because he "failed at every stage of his state court proceedings to develop the factual basis

necessary to support this claim."); *Taylor v. Horn*, 504 F.3d 416, 437 (3d Cir. 2007) (affirming the district court's decision denying an evidentiary hearing under § 2254(e)(2) and explaining that "[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.")

Finally, the Court notes that § 2254(e)(2) does not apply to an evaluation of whether to conduct an evidentiary hearing on a *gateway* actual innocence claim. *Cristin v. Brennan*, 281 F.3d 404, 413 (3d Cir. 2002). The decision whether to do so is a discretionary one. *Id.* In this case, a hearing on Petitioner's gateway actual innocence claim is not necessary because if he prevailed on it, the result would be that the Court would have to review Claims A though F on the merits. The Court has already done so and determined that none of those claims entitle Petitioner to habeas relief. Thus, no hearing is necessary on Petitioner's gateway actual innocence claim.[23]

Based upon the foregoing, Petitioner's request for an evidentiary hearing is denied.

## IV.   Certificate of Appealability

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. It provides that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from…the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court[.]" 28 U.S.C. § 2253(c)(1)(A). It also provides that "[a] certificate of appealability may issue...only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2).

---

[23] The Court also declines to hold an evidentiary hearing on Petitioner's gateway actual innocence claim given the strength of the evidence that Petitioner shot the victim and the inherent unreliability of the averments Terry made in his 2013 affidavit, which are not corroborated by other evidence (including Det. Ladley's 2008 Police Report).

"When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* Applying those standards here, jurists of reason would not find it debatable whether each of Petitioner's claims should be dismissed for the reasons given herein. Accordingly, the Court denies a  certificate of appealability on each of Petitioner's grounds for relief.

## V.  Conclusion

Based upon the foregoing, the Court will deny each of Petitioner's habeas claims and will deny a certificate of appealability with respect to each claim.

An appropriate Order follows.


Date:  June 23, 2021

/s/ Patricia L. Dodge
PATRICIA L. DODGE
United States Magistrate Judge